IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 21, 2026 Session

## AHA MECHANICAL CONTRACTORS, LLC v. SHELBY COUNTY BOARD OF EDUCATION

**Appeal from the Chancery Court for Shelby County**
**No. CH-21-1403-1  Melanie Taylor Jefferson, Chancellor**

————————————————————

**No. W2025-01107-COA-R3-CV**

————————————————————

This appeal requires us to determine whether the trial court erred in granting Appellee/Shelby County Board of Education's motion for summary judgment on its breach of contract claim against Appellant/Contractor. Because disputes of material fact and ambiguities arising therefrom exist, the trial court's grant of summary judgment is reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

STEVEN W. MARONEY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Scott A. Frick, Memphis, Tennessee, for the appellant, AHA Mechanical Contractor, LLC.

Jamie L. Morton, Memphis, Tennessee, for the appellee, Shelby County Board of Education.

## OPINION

### I. Background

#### A. Contract Formation and Scope

On or about February 11, 2020, Appellee Shelby County Board of Education ("SCBE") published Invitation for Bid No. 03022020 ("IFB") related to HVAC replacement at Riverview K-8 School (the "Riverview Project"). The IFB included the

Scope of Work for the Riverview Project. In relevant part, Section 3.0 of the Scope of Work states:

**3.0 SCOPE OF WORK**

The SCBE requests bids for Riverview K-8 HVAC Replacements. Replace existing cooling tower with new to match capacity, 500-ton, 1 440 GPM. Replacement shall include structural base, associated piping, and associated accessories such as by-pass valves. Concrete base shall be reviewed and verified to meet load & current code criteria. . . .

Appellant AHA Mechanical Contractors ("Contractor") submitted a bid on the Riverview Project, which bid SCBE accepted. The Riverview Project is governed by a Facilities Services Agreement signed by both parties (the "Contract"). The Contract bears the insignia of SCBE on its first page, and it appears undisputed in the record that the Contract was drafted by SCBE.

The Contract incorporates, by reference, several documents related to the Riverview Project, including the IFB and the Scope of Work. Paragraph 37 of the Contract requires that, "Contractor will observe and comply with all applicable local, state, and federal laws, ordinances, and regulations . . . ." Paragraph 15 expressly permits SCBE to terminate the Contract for cause if, among other reasons, Contractor substantially violates any provision of the Contract. In such case, the Contract provides for liquidated damages and an award of SCBE's reasonable attorneys' fees, costs, and expenses arising from such termination of the Contract.

## B. Communications Regarding the Concrete Base

The instant appeal arises from the parties' dispute concerning the Scope of Work language, "Concrete base shall be reviewed and verified to meet load & current code criteria." The SCBE asserts that this language requires Contractor to obtain a review and verification from a structural engineer. As discussed further below, the Contract does not define the term "load," nor does it specify which "current code criteria" are applicable.

After executing their Contract, the parties engaged in communication, via letters, emails, and in-person discussions, concerning the requirements regarding the concrete base. From our review, at the time the parties entered their Contract, the only existing "concrete base" was the original base on which the old HVAC was constructed, which remained after that system was dismantled so that the new HVAC system could be installed by Contractor. As discussed below, Contractor subsequently made modifications to the existing concrete base.

After SCBE notified Contractor that it would require an engineer's verification that the concrete base was "load" and "code" compliant, Contractor requested that its engineer, Mr. Marshall Davis, provide same. However, on October 20, 2020, Mr. Davis declined to write an engineer's letter that would address the concrete base for the cooling tower, stating:

> We have some concerns with how the slab was done. We do not feel comfortable writing a letter with the current as-built condition. The main concern is the overturning of the cooling tower during a high wind or seismic event. For us to write a letter we would require additional modification; however, another engineer may be willing to write a letter for the as-built condition.

Nonetheless, on October 29, 2020, Mr. Davis prepared a letter for Contractor, stating, "The as-built condition meets the overall design intent." The parties dispute whether Mr. Davis' "as-built condition" statement satisfies the "[c]oncrete base shall be reviewed and verified to meet load & current code criteria" requirement of the Contract. SCBE argues, and the trial court found, that, although Mr. Davis' October 29, 2020 letter states that the "as-built condition meets the overall design intent," it does not address the concrete base or state whether the concrete base was ever reviewed and verified to meet load and current code criteria before any modifications were made to it.

SCBE sent at least three letters to Contractor requesting that Contractor comply with its alleged contractual obligation to provide an engineer's verification that the concrete base would meet all load and code criteria. Although Contractor responded to these demands, none of the responses contained an engineer's opinion.

### C. Notices of Default and Termination of the Contract

On January 15, 2021, SCBE sent a letter terminating the Contract. The January 15th letter stated, in relevant part:

> Contractor is in default of its obligations under the Construction Contract for failure to perform the Work in accordance with the Contract Documents, including without limitation Contractor's failure to provide verification that the concrete base will meet load and current code criteria as required by the Scope of Work set forth in [the IFB]. Further, as expressly stated in the letter dated July 8, 2020, the engineer engaged by Contractor to review the cooling tower support frame based his opinion of the frame's sufficiency upon the assumption that "[t]he new cooling tower support frame will be installed on a new concrete foundation designed by others at the existing cooling tower location." Owner obtained an approved structural design for the new concrete cooling tower at no cost to Contractor. Nonetheless, Contractor has not

- 3 -

agreed to install a new concrete foundation that can be confirmed and verified by a licensed professional to meet load and code criteria as required by the IFB and has failed to perform the Work in accordance with the Contract Documents.

In response to SCBE's letter terminating the Contract, Contractor's attorney sent a letter to SCBE on January 28, 2021, stating, in relevant part:

[SCBE] does not have either a factual or legal basis for terminating the [Contract] . . . . All work performed by [Contractor] on the [Riverview] Project was performed in full compliance with the specifications included in the [IFB]. The current dispute is directly attributable to the lack of proper specifications developed by [SCBE] for what it apparently intended for this Project. In addition, various field modifications to the installation that were not contained in the specifications were installed as a direct result of requests made by [SCBE] representatives who are managing the Project on behalf of [SCBE].

[SCBE] has made demands upon my client for various certifications by an engineer as a direct result of the failure of [SCBE] to provide specifications in the [IFB] that it has deemed necessary subsequent to the execution of the [Contract]. At all times pertinent material hereto, [Contractor] has endeavored to meet the demands of [SCBE] despite the fact that those demands fall outside of the scope of work contained in the [Contract] and the specifications for the Project.

Following termination of the Contract, the Riverview Project was completed by Victor Hall Construction, LLC. Substantial completion of the Riverview Project occurred on August 31, 2021, and final completion did not occur until at least September 2021.

### D. Post-Termination Litigation

On October 8, 2021, Contractor filed suit against SCBE, claiming it unlawfully terminated the Contract. On December 10, 2021, SCBE filed an answer and a counterclaim against Contractor, seeking to recover $61,540.00 in temporary cooling expenses resulting from Contractor's alleged breach of the Contract, plus reasonable attorneys' fees recoverable thereunder. On February 9, 2024, SCBE filed a motion for summary judgment as to the Contractor's claim and its counterclaim for breach of contract. Contractor opposed the motion, which was heard on May 13, 2024.

On May 28, 2024, the trial court entered its initial order granting SCBE's motion for summary judgment. On June 26, 2024, Contractor filed a motion to alter or amend the May 28th order. In its motion, Contractor argued, *inter alia*, that SCBE had not submitted sufficient proof to establish the reasonableness of its attorneys' fees. Following a hearing

on September 11, 2024, the trial court entered an order on December 10, 2024, requiring SCBE to provide a statement of the work performed and one or two declarations from local attorneys supporting the reasonableness of the attorney's fees. Otherwise, Contractor's motion was denied.

SCBE provided the statement of work performed and the declarations as ordered by the trial court. Contractor then moved for hearing on the question of attorney's fees. The trial court granted the motion for hearing, and both parties filed supplemental memoranda regarding SCBE's attorney's fee award. On June 27, 2025, the trial court entered an Amended Order Granting the School Board's Motion for Partial Summary Judgment and Final Judgment. Therein, the trial court reduced the hourly rate provided by SCBE's attorneys, stating:

> While the Court finds that the rate of $400.00 per hour is reasonable for the legal work performed . . . the Court is concerned about compensating [SCBE] twice for the same work. Consequently, the court is awarding attorney's fees to [SCBE] at the rate of $310.00 per hour, reduced by the rate of $90.00 per hour to account for the attorneys' salaries paid by [SCBE]. Accordingly, the Court awards [SCBE] attorney's fees in the amount of $52,421.00 which is comprised of 169.1 hours of legal work at $310.00 per hour.

Contractor filed a timely notice of appeal.

## II. Issues

Contractor raises the following issues for review as stated in its brief:

1. Whether the Trial Court erred in granting summary judgment in favor of Shelby County Board of Education.
2. Whether the Trial Court erred in granting summary judgment in favor of Shelby County Board of Education on its claim for attorney's fees, and whether the amount of attorney's fees awarded was an abuse of discretion by the Trial Court.

In the posture of Appellee, SCBE raises the following additional issues for review as stated in its brief:

1. Whether the chancery court erred in amending its Order Granting Summary Judgment in favor of the School Board to reduce the hourly rate by which the contractual attorney fee award was calculated to account for the salaries paid by the School Board to its in-house attorneys; and
2. Whether this Court should award appellate attorneys' fees to the School Board based upon the terms of the Riverview Contract and remand this

- 5 -

matter to the chancery court for determination of the appropriate amount of appellate attorneys' fees to be awarded to the School Board.

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As the Tennessee Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co*. [*v. Zenith Radio Corp.*], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. . . . [A]fter adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage

is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65.

To the extent that we are required to review the trial court's interpretation of the parties' Contract, the Tennessee Supreme Court has instructed that the "cardinal rule [in interpreting contracts] . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 86 (Tenn. 1999) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "A determination of the intention of the parties 'is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide.'" *Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005) (quoting *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). Therefore, issues of contract interpretation are reviewed de novo. *See Dick Broad. Co.*, 395 S.W.3d at 659.

## IV. Analysis

To determine whether summary judgment was proper, we must decide whether the disputed contractual language is ambiguous, and, if so, whether any ambiguity can be resolved as a matter of law. However, we first note the submission of extensive parol evidence by both parties in their respective statements of undisputed material facts.

### A. Parol Evidence Submitted by the Parties

As noted above, the parties' dispute arises from the following language as set out in the Scope of Work section of their Contract, *i.e.,* "Concrete base shall be reviewed and verified to meet load & current code criteria." SCBE asserts that Contractor breached this requirement insofar as it did not tender an engineer's report verifying that the concrete base for the HVAC unit met "load & current code criteria."

### 1. SCBE's Statement of Undisputed Material Facts

In support of its motion for summary judgment, SCBE filed a statement of undisputed material facts (and supporting Exhibits, discussed *infra*).[1] In relevant part,

---

[1] Unless otherwise indicated, all grammar and emphases are reproduced as they appeared in the

SCBE's statement of undisputed material facts provided:

10. On June 29, 2020, [SCBE] sent an email to Contractor requesting "Engineers letter regarding the cooling tower foundation" [. . . Exhibit C].

11. On July 8, 2020, Contractor provided to [SCBE] a letter ("First Engineer Letter") signed by Marshall F. Davis of engineering firm Davis Patrikios Criswell. [. . . Exhibit D].

12. The First Engineer Letter stated that the engineering firm was asked to review the cooling tower support frame to determine if the frame capacity was sufficient for support of the new cooling tower. [Id.]

***

14. On October 8, 2020, [SCBE] notified Contractor that Contractor had not complied with its contractual obligation to provide verification that the concrete base would meet load and current code criteria ("First Notice of Default") [. . . Exhibit E].

15. Also on October 8, 2020, [SCBE] notified Contractor in an email that it required Contractor's strict compliance with that provision, expressly stating that, if Contractor intended to install the new cooling tower on the existing concrete base, [SCBE] "**is requiring** that the concrete base be reviewed and verified to ensure that it meets load & current code criteria." [. . . Exhibit F] (emphasis in original).

***

19. Ten days later, Contractor submitted an engineering letter dated October 29, 2020 that made no mention that the existing concrete base for the cooling tower had been reviewed and verified to meet load and current code criteria ("Second Engineer Letter") [. . . Exhibit J].

20. Meanwhile, by mid-October 2020, Contractor had filled the concrete base with crushed concrete and water, compacted the concrete/water mixture, drilled holes to remove the water, and added steel frames [. . . Exhibit K].

21. Contractor's engineer Mr. Davis declined to write an engineer letter that would address the concrete base for the cooling tower, stating: "We have some concerns with how the slab was done. We do not feel comfortable writing a letter with the current as-built condition. The main concern is the overturning of the cooling tower during a high wind or seismic event. For us to write a letter we would require additional modification; however, another engineer may be willing to write a letter for the as-built condition." [Exhibit

---

original submissions of the parties.

K . . .].

22. Following a telephone consultation with . . . Contractor on November 9, 2020, on November 11, 2020[, SCBE] sent a letter . . . requesting that Contractor provide an engineer letter verifying that the concrete base would meet all load and code criteria ("Third Notice of Default") [. . . Exhibit L].

23. A week later Contractor sent [SCBE] a letter dated November 19, 2020[,] purporting to include an "Engineer's Response" to issues raised by [SCBE], but Contractor's letter does not identify the name of the engineer [. . . Exhibit M].

24. At the time Contractor submitted the November 19, 2020 letter to [SCBE], Contractor's engineer had already informed Contractor that it could not write an engineer letter that the concrete foundation would meet load and current code criteria. [Exhibit K . . . Exhibit M].

25. On January 6, 2021, [SCBE] sent Contractor a Final Demand to Cure Default wherein [SCBE] demanded "that Contractor state in writing whether it intends to comply with its obligations by performing the Work as described in [SCBE's] December 10th letter and providing the required verifications by a licensed professional." ("Final Demand") [. . . Exhibit N].

26. The Final Demand required that the Contractor supply the requested statement of intent to [SCBE] on or before 5:00 p.m. on Friday, January 8, 2021. [Id.]

27. Contractor could not obtain an engineer letter from Mr. Davis verifying that the concrete base would meet all load and code criteria to be able to supply it to [SCBE]. [January 12, 2021 email between Contractor and Mr. Davis . . . Exhibit O].

28. On January 15, 2021, [SCBE] issued a Letter of Termination of Riverview Contract . . . ("Notice of Termination") [. . . Exhibit P].

SCBE's statement of undisputed material facts references Exhibits C, D, E, F, J, K, L, M, N, O, P, and these Exhibits were made attachments to SCBE's statement of undisputed material facts. In relevant part, the Exhibits included:

- **Exhibit C**—this June 29, 2020 email, sent from SCBE to Contractor requests the following: "Please provide the following as soon as they are available for the Riverview K8 Cooling Tower Replacement: . . . Engineers Letter regarding the cooling tower foundation."

- **Exhibit D**—this July 8, 2020 letter from Contractor's engineer, Mr. Davis, *i.e.*, "First Engineer Letter," provides:

> DPC, Inc. [*i.e.*, Davis, Patrikios, Criswell engineers, Mr. Davis' firm] was asked to review the cooling tower support frame provided by the equipment manufacturer . . . to

- 9 -

determine the frame capacity is sufficient for support of the new cooling tower. The new cooling tower support frame will be installed on a new concrete foundation designed by others at the existing cooling tower location. . . .

- **Exhibit E**—October 2020 letter from SCBE to Contractor, *i.e.* "First Notice of Default," stating:

  In the letter dated July 8, 2020, Marshall F. Davis states that DPC Inc., . . . was requested to review the cooling tower support frame provided by the equipment manufacturer to determine if the frame capacity is sufficient for support for the new cooling tower. The letter states, "The new cooling tower support frame will be installed on a new concrete foundation ***designed by others*** at the existing cooling tower location" [emphasis in original] . . . . The new concrete foundation design from a licensed structural engineer has not been received for review, comment, and/or approval. . . .
  
  Before any work will be able to progress, AHA Mechanical will complete the following:

  1. Provide a report from a licensed structural engineer stating that the existing concrete base/foundation will meet the load criteria of the new cooling tower and associated structural supports . . . . This report from a licensed structural engineer may also include recommendations or details for modifications to the existing concrete base/foundation to accept and support the new structural supports.
  2. Provide a detail from a licensed structural engineer for the new concrete foundation to comply with the July 8, 2020 letter from DPC Engineers that will support the new cooling tower support frame as well as current adopted code criteria that includes, but is not limited to, seismic and wind load criteria. This request will be waived if Item #1 has been executed.
  3. Provide documentation, *i.e*, compaction tests, from a licensed geotechnical testing agency that demonstrates that the loose fill that is currently in place at the existing concrete base meets the compaction requirements for the new concrete slab. The existing concrete base foundation must be prepped for new concrete slab installation per standard construction practices. This includes the removal of any debris such as redundant metals that include the existing steel angles and existing steel supports. Concrete slabs greater than 4" shall be steel

reinforced. Unless directed by a licensed structural engineer, the steel reinforcement must tie into the existing concrete base walls by steel reinforcing dowels epoxied into the existing base walls at depths determined by a structural engineer or separated by an expansion material around the perimeter. It is highly recommended to engage a licensed structural engineer regarding this matter to obtain proper direction.

- **Exhibit F**—this October 8, 2020 email from Mr. Floyd Gene Sides, Jr., the Director of Construction for SCBE, to Contractor provides, in part:

    From the discussions today and the scheduled concrete pour statement in your email response below, would it be incorrect in stating that AHA Mechanical is installing the new cooling tower and new steel support frame on the existing concrete base? If so, it should be noted and brought to your attention that this installation is not in compliance with your engineer's letter regarding installation. The letter from your engineer states that the new cooling tower support frame will be installed on **a new concrete foundation designed by others** [emphasis in original]. Who is AHA Mechanical having design this new concrete foundation? Have the details been provided to [SCBE] for review, comment, and approval? This is the reason for the allowance request for the engineering fee of $5,000,00 in the solicitation.
    If AHA Mechanical is intending to use the existing concrete base, [SCBE] **is requiring** that the concrete base be reviewed and verified to ensure that it meets load & current code criteria [emphasis in original]. To assist in clarifying what the district means by this request, the following information is being provided:

    The "load" is defined as the weight of the new cooling tower, new structural steel frame supports, and any other new components associated with the installation including the anchor bolt attachments. The "current code criteria" is in regards to the existing concrete base meeting current codes. As you may be aware, Shelby County Code Enforcement requires that all new HVAC equipment installations must meet the current adopted building code. In addition to this, any existing appurtenances that the new equipment is being attached or installed upon must be brought up to current code as well or **confirmed that the existing appurtenances meet the current**

- 11 -

**code** [emphasis in original]. This includes Section 1601 "Seismic" of the International Building Code since Memphis is classified as being in a Zone D seismic zone which in simpler terms means very active.

As part of best construction practices, most firms or companies would engage a licensed structural engineer to make this confirmation on their behalf with any recommendations or improvements due to the significant liability. This significant liability includes accountability of the company installing the new cooling tower will be held liable for any failure or compromise to the existing concrete base due its inability to support the load of the new cooling tower, new structural steel support frame, and associated attachments. This will also include liability due to failure of the existing concrete base during a seismic or severe wind event since modifications were not implemented to the foundation prior to the installation of the new equipment. From our experience and relationship with Shelby County Code Enforcement, Shelby County Code Enforcement will only accept or consider valid the written confirmations from state licensed architects or engineers.

With all that stated, please provide the documentation showing that the existing concrete base has been confirmed that it meets the current adopted codes and will support the weight and load of the new cooling tower, the new structural steel support frame, and provide adequate opportunity for the anchor bolt attachments as required in the letter from your engineer.

This documentation does not have to be from a structural engineer but shall include language that states AHA Mechanical Contractors will take full and complete responsibility and liability in regards to the existing concrete base and its ability to meet the load criteria of the new installation as well as meets the current adopted building code requirements for such installation.

- **Exhibit J**—this October 29, 2020 letter from Mr. Davis. *i.e.,* "Second Engineer Letter," restates verbatim the information from his July 8, 2020 letter set out above, with the exception of the following language, which is omitted from the October 29 letter: "DPC, Inc. has reviewed the frame for the structural support of the tower and the frame is sufficient." Rather, the October 29th letter states:

  DPC has required additional attachment points of the frame to the new foundation, designed by others, to prevent overturning

of the cooling tower. The additional required attachments are as follows:

• 4" x 6" x 3/8" x 1'-0" clip angles long leg vertical at 4 locations w/ (2) 5/8" dia. Titen HD's or equal with 4" min. embedment into the existing conc. wall. The angles can be welded to the beam bottom flange or bolted. If bolting use (2) ¾" bolts and provide long slotted holes in the clip angles. Clip angles shall be finished same as the steel frame;
• Weld the exterior bottom beam flange to the column cap plates, all locations 4" x 3/16" min. fillet weld;
• All welds shall be painted with a cold galvanizing paint or equal.

DPC, Inc. has reviewed photos of the as-built condition with the additional required attachments. The as-built condition meets the overall design intent.

- **Exhibit K**—October 19 and 20, 2020 emails between Latisha Rhodes, "Estimator" for Contractor, and Mr. Davis:

[From Ms. **Rhodes to Mr. Davis, October 19 at 9:35 a.m.**— "We did use the existing base and filled with crushed concrete, it was then filled with water and then compacted, then drilled se[e]p holes in the walls to remove the water and added 4" steel columns schedule 80 and added 4000 psi concrete with fiber and steel added, in which the steel frame will be set on with 8" anchors for steel frame support."

[**From Mr. Davis to Ms. Rhodes, October 19 at 12:59 p.m.**]— "Please provide the following: • You added steel columns, what do they attach to/bear on? Just to confirm you did not reuse the existing steel columns? • Was the reinforcing used in the slab wire mesh [or] welded wire fabric? • How thick is the slab? • How much concrete is over the column cap plates? • What are the 8"0 steel anchors? How many? Where are they located?"

[**From Ms. Rhodes to Mr. Davis, October 20 at 8:50 a.m.**]— "Are you going to be going to Riverview . . . today to look at foundation? Asking so I can have my guy meet you there. The anchor bolts will not be in until Wednesday."

[**From Mr. Davis to Ms. Rhodes October 20 at 3:16 p.m.**]— "We have reviewed the previously provided information for the Riverview K8 school from emails and taken the information into consideration from the phone call on 10-20-20. We have some concerns with how the slab was done. We do not feel comfortable writing a letter with the current as-built condition. The main concern is the overturning of the cooling tower during a high wind or seismic event. For us to write a letter we would require additional modification; however, another engineer may be willing to write a letter for the as-built

condition."

- **Exhibit L**—this November 11, 2020 letter from Mr. Sides to Contractor states:

    From the consultation meeting held Monday November 9, 2020 at 1:00 p.m., [SCBE] has agreed to provide additional and more specific details regarding the clarifications of the current work in progress at Riverview K-8 School. . . .
        The intent of these requests is to ensure [SCBE] will obtain a final product that is completed effectively and efficiently with standard construction practices to meet current applicable codes that will result in a finished product with minimal to zero long-term issues specifically related to the existing cooling tower foundation and its modifications.

    The following specific confirmations are being requested in written format:

    1. Confirmation from a structural engineer that the existing concrete base in its original condition prior to the current modifications and without its current modifications will meet the load of the new cooling tower and structural support frame and comply with any applicable codes. This was the original requirement of the solicitation.
    2. Confirmation and approval from the Contractor's structural engineer that the existing modifications completed by the Contractor to the existing concrete base meet the criteria of the letters from the structural engineer, Davis Patrikios Criswell, dated July 8, 2020 and October 29, 2020. The specific confirmations include:

    A. Confirmation from their structural engineer that the new composite fill installed by the Contractor in the existing concrete base meets applicable codes in regards to type, compaction, and moisture content specific to this installation as this is a modification to the existing concrete base. Fill type can be determined by a lift ticket from the fill supplier. []
    B. Confirmation from their structural engineer that the new composite fill installed by the Contractor will support the new concrete slab as installed as this is considered a modification to the existing concrete base.
    C. Confirmation and approval from their structural engineer that the thickness of the new concrete slab installed by the

Contractor meets the requirement in the engineer's letter dated July 8, 2020 for the required eight-inch (8") minimum embedment of the anchor bolts. Standard construction practices require a ten (10") inch to twelve (12") thick slab to acquire an eight-inch (8") embedment.

D. Confirmation from their structural engineer that the new concrete slab installed by the Contractor does not require steel reinforcement for the condition that it is currently installed specific to applicable codes for this installation. See International Mechanical Code Section 908.4

E. Confirmation from their structural engineer that the new concrete slab installation is not required to be tied into the existing concrete base as this is a modification to the existing concrete base. See international Mechanical Code Section 908.4 []

F. If tie-ins to the existing concrete base are not required, confirmation from their structural engineer that expansion material is not required for movement between two (2) separate structural components specific to the new concrete slab and the existing concrete base wall as this is a modification and impact to the existing concrete base. See international Mechanical Code Section 908.4 []

G. Confirmation and approval from their structural engineer that the new concrete slab as installed without control joints by the Contractor will perform and not crack with the existing metal grate support steel angles and existing structural beam that are encased within the new concrete slab as this is considered a modification to the existing concrete base. []

H. Confirmation and approval from their structural engineer that the new steel post and metal plates installed by the Contractor in the fill of the existing concrete base meet the applicable codes in regards to seismic (lateral load) and wind uplift as this is considered a modification to the existing concrete base. This is specifically in reference to the anchoring method, if implemented, of the steel posts to the existing concrete base under the unknown fill type. See International Mechanical Code Section 908.4 []

I. Confirmation from their structural engineer that the existing reinforced concrete base slab will be able to support the current foundation modifications by the Contractor that include but are not limited to the new composite fill, new concrete slab, existing encased steel components, new metal posts & angles, new structural steel frame, and new cooling tower equipment.

3. Confirmation and approval from their structural engineer that the new steel support frame as provided and currently installed by the Contractor is acceptable in comparison to the "Suggested Steel Support" drawing provided in the letter dated July 8, 2020. The current frame configuration does not appear to be in compliance or match the configuration of the manufacturer suggested detail. Any deviations from the referenced detail or any modifications to the frame layout and/or its components must be approved by their structural engineer prior to installation. See International Mechanical Code Section 908.4 []

4, Confirmation and approval from their structural engineer that the flange type used in the current steel support frame, a single steel plate welded on one side, is acceptable as this flange type deviates from the manufacturer's suggested steel support detail. The suggested detail shows steel clip angles welded to each beam and bolted into both members. []

5. Confirmation and approval from their structural engineer that the single sided welds of the single plate flanges to the new steel frame are acceptable in reference to standard welding practices and meet applicable codes. The field welds are a deviation from the "Suggested Steel Support" detail. The concern of the welds is due to only one weld has been provided on a single flange plate consisting of six potential welding points. []

6. Confirmation and approval from their structural engineer that it is acceptable to have a spliced steel beam rather than a continuous steel beam. The current material provided has a splice joint in two longitudinal beams that are a deviation from the manufacturer's suggested support detail. The suggested steel support detail drawing references a steel flange plate bolted to each member at the end joint along the longitudinal support. []

- **Exhibit M**— November 19, 2020 letter from Contractor to SCBE, stating:

  We received additional more specific details regarding the clarification of the current work in progress at Riverview K-8 School.

  The intent of this letter is to respond to the specific details. We feel [SCBE] will obtain a final product that is completed effectively and efficiently with the specifications and direction

we were provided from the bid documents and the requirements stated in the IFB scope of work along with the direction of Clay Rudolph at the site visit. We obtained engineer letters as requested and we made the modifications recommended by the Engineer of DPC. There are items listed that if requested should have been put into specification during the bid process. We can't be expected to perform items that were not in any specs for this project. We have obtained an Engineer to ensure that the project meets manufacturers recommendations and load. We would be happy to take care of any of the additional items listed below if they were in the pre-bid specifications we were provided or with additional compensation for anything not in the bid specifications.

1. Confirmation from a structural engineer that the existing concrete base in its original condition prior to the current modifications and without its current modifications will meet the load of the new cooling tower and structural support frame and comply with any applicable codes. This was the original requirement of the solicitation.

**Engineer Response**: The existing cooling tower weighs 16,500 lbs. and the new cooling tower weighs 11,800 lbs. The existing foundation has the capacity to support the new cooling tower.

2. Confirmation and approval from the Contractor's structural engineer that the existing modifications completed by the Contractor to the existing concrete base meet the criteria of the letters from the structural engineer, Davis Patrikios Criswell, dated July 8, 2020 and October 29, 2020. The specific confirmations include:

A. Confirmation from their structural engineer that the new composite fill installed by the Contractor in the existing concrete base meets applicable codes in regards to type, compaction, and moisture content specific to this installation as this is a modification to the existing concrete base. Fill type can be determined by a lift ticket from the fill supplier. []

**Engineer Response**: The fill material used was acceptable; however, we cannot verify the compaction as placement and compaction were performed by others without the direction of

DPC. Field testing would be required to determine compaction.

**AHA Mechanical Response**: The fill material used was crushed concrete per fill ticket and flushed with water and compacted with 11,000 lb. machine. The July 8, 2020 engineer letter was revised to include foundation and frame and sent on October 29, 2020.

B. Confirmation from their structural engineer that the new composite fill installed by the Contractor will support the new concrete slab as installed as this is considered a modification to the existing concrete base.

**Engineer Response**: Compaction would have to be certified to confirm.

C. Confirmation and approval from their structural engineer that the thickness of the new concrete slab installed by the Contractor meets the requirement in the engineer's letter dated July 8, 2020 for the required eight-inch minimum embedment of the anchor bolts. Standard construction practices require a ten-Inch (10") to twelve (12") thick slab to acquire an eight-inch (8") embedment.

**Engineer Response**: The anchor bolts will not have 3" of concrete cover.

**AHA Mechanical Response**: The concrete foundation is 8" this and the anchors are 8" and does not protrude through the concrete and therefore when tightened, it causes the shaft to draw and spreads the shank into the concrete it is embedded in. It is designed to keep from pulling the bolt or shank through the concrete when there is pressure put against what is designed to hold. So therefore it would be impossible to pull the shank through the concrete.

D. Confirmation from their structural engineer that the new concrete slab installed by the Contractor does not require steel reinforcement for the condition that it is currently installed specific to applicable codes for this installation. See International Mechanical Code Section 908.4

**Engineer Response**: Additional attachment points were

provided to resist overturning.

**AHA Mechanical Response**: The pictures attached in the original detail specifications were in process pictures. I am including pictures of after Engineer recommendations were complete and the manufacturer design of frame was complete.

E. Confirmation from their structural engineer that the new concrete slab installation is not required to be tied into the existing concrete base as this is a modification to the existing concrete base. See International Mechanical Code Section 908.4 [].

**AHA Mechanical Response**: This was not a modification that was requested by engineer at the time and not in the specs for this project. The steel frame is tied to the existing wall. We did no modification to the existing, we only added to it.

F. If tie-ins to the existing concrete base are not required, confirmation from their structural engineer that expansion material is not required for movement between two (2) separate structural components specific to the new concrete slab and the existing concrete base wall as this is a modification and impact to the existing concrete base. See International Mechanical Code Section 908.4 []

**AHA Mechanical Response**: See E response.

G. Confirmation and approval from their structural engineer that the new concrete slab as installed without control joints by the Contractor will perform and not crack with the existing metal grate support steel angles and existing structural beam that are encased within the new concrete slab as this is considered a modification to the existing concrete base. []

**AHA Mechanical Response**: There is [sic] no steel beams of angle in the concrete or fill that the tower sets on. []

H. Confirmation and approval from their structural engineer that the new steel post and metal plates installed by the Contractor in the fill of the existing concrete base meet the applicable codes in regards to seismic (lateral load) and wind uplift as this is considered a modification to the existing

concrete base. This is specifically in reference to the anchoring method, if implemented, of the steel posts to the existing concrete base under the unknown fill type. See International Mechanical Code Section 908.4 []

**Engineer Response**: DPC recommended additional attachment points to the walls for seismic requirements.

**AHA Mechanical Response**: Tony [Wright, SCBE's representative] asked for the columns and plates to be put into the concrete to allow for additional load for steel frame for the tower. We did the recommended attachment points per the engineer's request.

I. Confirmation from their structural engineer that the existing reinforced concrete base slab will be able to support the current foundation modifications by the Contractor that include but are not limited to the new composite fill, new concrete slab, existing encased steel components, new metal posts & angles, new structural steel frame, and new cooling tower equipment.

**Engineers Response**: Geotechnical engineer would be required to test the area for the documentation you are requesting.

**AHA Mechanical Response**: We did not modify the existing foundation[;] we added to it. Engineer letter advised it would support new tower. No specs stating a Geotest to be done.

3. Confirmation and approval from their structural engineer that the new steel support frame as provided and currently installed by the Contractor is acceptable in comparison to the "Suggested Steel Support" drawing provided in the letter dated July 8, 2020. The current frame configuration does not appear to be in compliance or match the configuration of the manufacturer suggested detail. Any deviations from the referenced detail or any modifications to the frame layout and/ or its components must be approved by their structural engineer prior to installation. See International Mechanical Code Section 908.4 []

**Engineer Response**: The steel support frame should meet the manufacture's requirements. We were told by AHA it does.

**AHA Mechanical Response**: The frame meets the manufacture's requirements. []

4. Confirmation and approval from their structural engineer that the flange type used in the current steel support frame, a single steel plate welded on one side, is acceptable as this flange type deviates from the manufacturer's suggested steel support detail. The suggested detail shows steel clip angles welded to each beam and bolted into both members. []

**Engineer Response**: This should be done per the manufacturer.

**AHA Mechanical Response**: Items have been completed to match the manufacturer drawing and meets the specifications of the manufacturer design.

5. Confirmation and approval from their structural engineer that the single sided welds of the single plate flanges to the new steel frame are acceptable in reference to standard welding practices and meet applicable codes. The field welds are a deviation from the "Suggested Steel Support" detail. The concern of the welds is due to only one weld has been provided on a single flange plate consisting of six potential welding points. []

**Engineer Response**: Welds shall follow AISC and AWS standards.

**AHA Mechanical Response**: Manufacturer recommended plates have been put in.

6. Confirmation and approval from their structural engineer that it is acceptable to have a spliced steel beam rather than a continuous steel beam. The current material provided has a splice joint in two longitudinal beams that are a deviation from the manufacturer's suggested support detail. The suggested steel support detail drawing references a steel flange plate bolted to each member at the end joint along the longitudinal support. []

**Engineer Response**: Welds would need to be tested for

compliance or meet the manufacture's requirements.

**AHA Mechanical Response**: The bolted flanges have been added per manufacturer's recommendations.

**Engineer Last Remarks**: The manufacturer provides detailed guidance and gives the engineer some leeway; however, any deviation from the manufacture's recommendations would require calculations from the engineer. The best solution is not to deviate.

**AHA Mechanical Last Remarks**: We have followed the manufacture's drawing and specifications, have not deviated as requested from engineer. The pictures provided with this original claim were in process pictures, in which a lot was still to be done and was done by the time this request to our surety company was sent, The only thing we were given for this bid was a 1996 and 60's drawing and the IFB scope of work, and the direction from Clay Rudolph at the pre-bid meeting. We were advised to build frame to manufacturer specifications, and we have done that. Yes, we will own that the frame had to have some additional items and that has been completed. I am happy to have the specific details from the School System with all of the above information, however this should have been provided as the specifications for this project during the bidding process, if all of this was to be performed. We only had direction from IFB scope of work (I have included the scope) and Pre-bid and Engineer recommendations and we have followed those guidelines. We are happy to do any additional items being requested with reimbursement as these items should have been part of the specifications of the job. I understand you may think this is standard practice items but we are taught to go strictly by the specifications provided and from the Pre-Bid and unfortunately we were not given any specifications for this job other that the option to use existing foundation, demo it, or backfill and to follow manufacturer design for the frame. We feel that we have performed what we were contracted to do.

- **Exhibit N**— January 6, 2021 letter from Mr. Sides to AHA, stating:

  On October 16, 2020, [SCBE] provided to Contractor . . . a written Notice Prior to Declaring Default . . . . On November

9, 2020, Contractor and [SCBE] participated in a conference pursuant to Section 3.1 of the Performance Bond, which conference continued through written communications exchanged between [SCBE] and Contractor . . . .

As requested by Contractor at the November 9 conference, [SCBE] provided on November 11, 2020[,] a detailed explanation of actions necessary to Contractor's compliance with its obligations under the Contract Documents. Specifically, [SCBE] sought written confirmations from a structural engineer regarding the integrity and fitness of the concrete base and other aspects of the project. Though Contractor responded on November 19, 2020, Contractor failed to provide the requested confirmations and to otherwise sufficiently address Contractor's defaults. Significantly, the November 19 letter was not signed by a structural engineer and did not otherwise bear any stamp or indication of agreement or acceptance by a structural engineer or other qualified professional. Moreover, Contractor's responses indicated that the concrete base could not be verified or confirmed as in compliance with applicable criteria.

By letter dated December 10, 2020, [SCBE] notified Contractor that Contractor's responses did not sufficiently or satisfactorily resolve the issues. [SCBE] specifically stated that [SCBE] is requiring that Contractor provide a concrete base foundation "that can be confirmed and verified by a licensed professional to support all the loads of the new steel support frame and cooling tower as well as meet all current applicable codes" . . . . In a good faith effort to cooperatively resolve the issues, [SCBE] obtained an approved structural design at no cost to Contractor. Contractor has failed to perform the required Work or provide the required verifications and has not provided any response to [SCBE's] December 10 letter.

Contractor remains in default of its obligations under the Construction Contract for failure to perform the Work in accordance with the Contract Documents, including without limitation Contractor's failure to provide verification that the concrete base will meet load and current code criteria as required by the Scope of Work set forth in [IFB] and other Contract Documents.

[SCBE] hereby demands that Contractor state in writing whether it intends to comply with its obligations by performing the Work as described in [SCBE's] December 10th letter and providing the required verifications by a licensed professional.

If such statement is not received by [SCBE] on or before **5:00 p.m. on Friday, January 8, 2021** [emphasis in original], [SCBE] will take steps to enforce its rights and remedies under the Contract Documents . . . and applicable law.

- **Exhibit O**— January 2021 emails between Ms. Rhodes and Mr. Davis following Mr. Davis' review of SCBE's January 6, 2021 letter:
  **[From Mr. Davis to Ms. Rhodes, January 6, at 3:54 p.m.]**— "We would recommend having the items tested for confirmation and provide the documentation to [SCBE]. Geotechnology or PSI can perform compaction testing and anything else that might be needed. Of course make sure [SCBE] is fine with that before doing the additional testing."
  **[From Ms. Rhodes to Mr. Davis, January 6, at 4:00 p.m.]**— "So are you not willing to sign off on your comments I included in our letter [of November 19, 2020]? That is all that I am asking because as stated, there are no specifications for this job and they are wanting us to spend more money on different testing for modifying the existing foundation in which we didn't modify, we added a backfill and foundation on top."
  **[From Mr. Davis to Ms. Rhodes, January 6, at 4:11 p.m.]**— "I may be wrong, but I do not think [SCBE] will accept anything else."
  **[From Ms. Rhodes to Mr. Davis, January 6, at 4:20 p.m.]**— "The original email on 12/10 stated they wouldn't accept your responses I typed into the letter because you didn't sign the letter and I didn't include you on the email. Our attorney is the one that suggested that, so they could see I didn't just make the responses up."
  **[From Ms. Rhodes to Mr. Davis, January 6, at 4:23 p.m.]**— "Which [to] my understanding [i]s your most recent engineer letter or may have been the responses you sent me on the questions they were asking advised the foundation would withstand the load."
  **[From Ms. Rhodes to Mr. Davis, January 12, 2021 at 9:24 a.m.]**— "Are you able to provide your stamp on your responses I included in letter or a separate letter with your responses? Please advise as we are past our deadline."

- **Exhibit P**— January 15, 2021 "Notice of Termination" letter from Mr. Sides to Contractor, stating, in part:

  . . . [SCBE] hereby provides notice of the termination of the [Contract] executed between Contractor and [SCBE] on or about May 12, 2020 ("Construction Contract") governing work to be performed at Riverview K-8 School in Memphis. . . .
     Contractor is in default of its obligations under the Construction Contract for failure to perform the Work in accordance with the Contract Documents, including without

limitation Contractor's failure to provide verification that the concrete base will meet load and current code criteria as required by the Scope of Work set forth in . . . [IFB]. Further, as expressly stated in the letter dated July 8, 2020, the engineer engaged by Contractor to review the cooling tower support frame based his opinion of the frame's sufficiency upon the assumption that "[t]he new cooling tower support frame will be installed on a new concrete foundation designed by others at the existing cooling tower location." [SCBE] obtained an approved structural design for the new concrete cooling tower at no cost to Contractor. Nonetheless, Contractor has not agreed to install a new concrete foundation that can be confirmed and verified by a licensed professional to meet load and code criteria as required by the IFB and has failed to perform the Work in accordance with the Contract Documents.

 . . . . On November 9, 2020, Contractor and [SCBE] participated in a conference . . ., which conference continued through written communications exchanged between [SCBE] and Contractor . . . . The parties have not reached an agreement with respect to Contractor's default under the Construction Contract.

On January 6, 2021, [SCBE] sent to Contractor . . . a Final Demand for Cure of Contractor's Default wherein [SCBE] demanded that Contractor state in writing whether it intends to comply with its obligations by, among other things, providing a concrete base foundation that can be confirmed and verified by a licensed professional to support all the loads of the new steel support frame and cooling tower and meet all applicable codes. [SCBE] notified Contractor that if such statement was not received by [SCBE] on or before 5:00 p.m. on Friday, January 8, 2021, [SCBE] would take steps to enforce its rights and remedies under the Contract Documents. . . and applicable law.

As of the date of this letter, Contractor has not provided the statement requested in [SCBE's] January 6th letter and remains in default of its obligations under the Contract Documents.

As a result of Contractor's default and the failure of the consultation process to generate an acceptable resolution, [SCBE] hereby terminates the Construction Contract for cause pursuant to Paragraph 15 of the Construction Contract . . . .

Throughout these proceedings, Contractor has maintained that SCBE breached the

Contract by terminating same based on its belief that Contractor failed to comply with the requirement to provide an engineer's report concerning the concrete base. Contractor maintains that SCBE's "demands . . . for various certifications by an engineer [are the] direct result of the failure of [SCBE] to provide specifications in the [IFB] that it has deemed necessary subsequent to the execution of the [Contract]."

### 2. Contractor's Response to SCBE's Statement of Undisputed Material Facts

In its response to SCBE's statement of undisputed material facts in support of its motion for summary judgment, Contractor stated, in relevant part:

> 8. The Riverview Contract provides for liquidated damages resulting from Contractor's breach . . . .
> **RESPONSE**: Admitted in part and denied in part. In order for AHA Mechanical to be liable [to SCS], SCS has to prove that AHA Mechanical failed to honor its obligations under the Riverview Contract. As is demonstrated throughout its Responses to the SCS's Statement of Undisputed Facts and AHA Mechanical's Statement of Material Facts, AHA Mechanical disputes that it breached the Riverview Contract.

***

> 19. . . . Contractor submitted an engineering letter dated October 29, 2020 that made no mention that the existing concrete base for the cooling tower had been reviewed and verified to meet load and current code criteria ("Second Engineer Letter") [. . . Exhibit J].
> **RESPONSE**: Admitted in part and denied in part. It is admitted that the Second Engineer Letter was sent. The Second Engineer Letter specifically stated that "[t]he as-built condition meets the overall design intent."
> 20. Meanwhile, by mid-October 2020, Contractor had filled the concrete base with crushed concrete and water, compacted the concrete/water mixture, drilled holes to remove the water, and added steel frames. [October 19, 2020 email . . . made Exhibit 14 to Rhodes Dep. at Exhibit K].
> **RESPONSE**: Admitted.
> 21. Contractor's engineer Mr. Davis declined to write an engineer letter that would address the concrete base for the cooling tower, stating: "We have some concerns with how the slab was done. We do not feel comfortable writing a letter with the current as-built condition. The main concern is the overturning of the cooling tower during a high wind or seismic event. For us to write a letter we would require additional modification; however, another engineer may be willing to write a letter for the as-built condition." [Exhibit K October 20, 2020 email . . .].
> **RESPONSE**: Admitted in part and denied in part. While the email from Mr.

- 26 -

Davis does make that statement, Mr. Davis did in fact issue the Second Engineer Letter which specifically states that "[t]he as-built condition meets the overall design intent." In addition, Mr. Davis issued a third letter confirming that the as-built condition met the overall design intent and that "[t]he bolts installed in the slab are sufficient to resist the lateral shear loads caused by wind or seismic. The additional connections made to the interior steel columns and concrete walls were designed to prevent overturning of the cooling tower." See Exhibit C to Declaration of Donna Burlon.

22. Following a telephone consultation with . . . Contractor on November 9, 2020, on November 11, 2020 [SCBE] sent a letter . . . requesting that Contractor provide an engineer letter verifying that the concrete base would meet all load and code criteria ("Third Notice of Default") [. . . Exhibit L].

**RESPONSE**: For purposes of this Motion only, it is admitted that a representative sent the November 11, 2020 letter, but it is denied that the Riverview Contract placed any obligation on AHA Mechanical to provide any other information other than the Second Engineer Letter which verified that "[t]he as-built condition meets the overall design intent."

\*\*\*

24. At the time Contractor submitted the November 19, 2020 letter to the School Board, Contractor's engineer had already informed Contractor that it could not write an engineer letter that the concrete foundation would meet load and current code criteria. [Exhibit K . . .; Exhibit M].

**RESPONSE**: Denied. The Riverview Contract placed no obligation on AHA Mechanical to provide any other information other than the Second Engineer Letter which verified that "[t]he as-built condition meets the overall design intent."

\*\*\*

26. The Final Demand required that the Contractor supply the requested statement of intent to the School Board on or before 5:00 p.m. on Friday, January 8, 2021.

**RESPONSE**: For purposes of this Motion only, it is admitted that Exhibit N was sent to AHA Mechanical and contained that deadline. However, the contents of Exhibit N are denied. The Second Engineer Letter specifically stated that "[t]he as-built condition meets the overall design intent." Further, the Riverview Contract placed no obligation on AHA Mechanical to provide any other information other than the Second Engineer Letter which verified that the that "[t]he as-built condition meets the overall design intent."

### 3. Contractor's Statement of Additional Undisputed Material Facts

In addition to the foregoing responses, Contractor submitted the following statement of additional undisputed material facts:

1. The pre-bid meeting for the Riverview Elementary K-8 cooling tower replacement project was conducted by Clay Rudolph. See Declaration of Larry Raymer at ¶ 4.

2. The existing cooling tower sat on a concrete basin that originally contained cooling water. See Declaration of Larry Raymer at ¶ 4.

3. The replacement cooling tower did not require the water basin, and during the pre-bid meeting, Mr. Rudolph was specifically asked if the basin had to be demolished and the new cooling tower mounted directly on the foundation under the basin. See Declaration of Larry Raymer at ¶ 4.

4. Mr. Rudolph stated that the basin could either be demolished and the new cooling tower mounted directly on the foundation, or the basin could be backfilled and the cooling tower mounted on the basin. See Declaration of Larry Raymer at ¶ 4.

5. Based upon Mr. Rudolph's statement that the basin could either be demolished and the cooling tower mounted on the ground or the basin backfilled and the cooling tower mounted on top of the basin, AHA Mechanical Contractors elected to backfill the basin with crushed concrete and the frame for the new cooling unit mounted to the basin. See Declaration of Larry Raymer at ¶ 5.

6. The basin was backfilled with crushed concrete and compacted with a 11,000 pound compacting machine. See Declaration of Larry Raymer at ¶ 6.

7. After this was done, Mr. Tony Wright of Shelby County Schools requested that the concrete cap [] be placed on top of the crushed concrete be increased from 6 inches to 8 inches. See Declaration of Larry Raymer at ¶ 6.

8. Mr. Wright further requested that steel pilings be placed at various locations within concrete fill going from the cooling tower support frame down to the foundation. See Declaration of Larry Raymer at ¶ 6.

9. Even though none of this was specified in the bid documents, scope of work or drawings prepared by Shelby County Schools, this additional work was performed as requested by Shelby County Schools. See Declaration of Larry Raymer at ¶ 6.

10. The concrete cap for the basin was then poured utilizing 4000 pound-per-square inch strength concrete. See Declaration of Larry Raymer at ¶ 7.

11. The support frame for the new cooling tower was then attached to the basin as directed by a structural engineer retained by AHA Mechanical Contractors. See Declaration of Larry Raymer at ¶ 7.

12. Before the cooling tower could be mounted to the frame, Shelby County Schools began demanding letters from an engineer stating that the installation work met current building codes. See Declaration of Larry

Raymer at ¶ 8.

13. All work performed by AHA Mechanical was done in compliance with all applicable building codes. See Declaration of Larry Raymer at ¶ 9.

14. The concrete cap that was poured on the top of the basin functions solely for the purpose of capping off the basin and was not constructed to support the frame. See Declaration of Larry Raymer at ¶ 10.

15. The frame is supported totally by the walls of the basin and the additional steel piles which penetrate through the concrete backfill down to the concrete foundation and attached to the steel frame at various locations. See Declaration of Larry Raymer at ¶ 10.

16. Compliance with code requirements for seismic and wind loading is accomplished by the fact that the support frame is attached with welding and other fittings to the concrete basin. See Declaration of Lany Raymer at ¶ 11.

17. Moreover, the concrete basin is more than adequate to support the new cooling tower because it weighs significantly less than the original cooling tower supported by the cooling tower basin. See Declaration of Larry Raymer at ¶ 11.

18. AHA Mechanical Contractors retained Marshall Davis, P.E. of the engineering firm Davis Patrikios Criswell, Inc. to review certain information, contract documents and other information regarding the cooling tower installation. See Declaration of Donna Burlon at ¶ 3.

19. On July 8, 2020, Mr. Davis prepared a letter regarding his analysis of [the] frame for the structural support for the cooling tower. See Declaration of Donna Burlon at ¶ 3; Exhibit "A" to Declaration of Donna Burlon.

20. After AHA Mechanical Contractors began its work on the project, Shelby County Schools requested a letter from an engineer regarding the as-built conditions of the structure supporting the new cooling tower. See Declaration of Donna Burlon at ¶ 4.

21. On October 29, 2020, a second letter was prepared and submitted by Mr. Davis. See Declaration of Donna Burlon at ¶ 4; Exhibit "B" to Declaration of Donna Burlon.

22. On March 3, 2021, a third letter was prepared by Mr. Davis to respond to several additional questions raised by Shelby County Schools in a letter dated November 11, 2020 about the as-built conditions of the cooling tower support. See Declaration of Donna Burlon at ¶ 5; Exhibit "C" to Declaration of Donna Burlon

23. On January 28, 2021, counsel for AHA Mechanical transmitted a letter to counsel for SCS denying that SCS had any legal or factual grounds to terminate the Riverview Contract and further pointed out that SCS had failed to follow contractual requirements to properly terminate the Riverview Contract. See Declaration of Scott A. Frick, Esq. at ¶ 2; Exhibit "A" to Declaration of Scott A. Frick, Esq.

We have reviewed the declarations referenced in Contractor's statement of additional undisputed material facts. Mr. Larry Raymer, Contractor's Project Manager for the Riverview Project, declared, in relevant part:

3. I was the Project Manager for AHA Mechanical Contractors for the Riverview Elementary K-8 cooling tower replacement project for [SCBE]. That project involved the removal of an existing cooling tower and replacing it with a new cooling tower.

4. The pre-bid meeting for the Riverview Elementary K-8 cooling tower replacement project was conducted by Clay Rudolph. The existing cooling tower sat on a concrete basin that originally contained cooling water. The replacement cooling tower did not require the water basin, and during the pre-bid meeting, Mr. Rudolph was specifically asked if the basin had to be demolished and the new cooling tower mounted directly on the foundation under the basin. Mr. Rudolph stated that the basin could either be demolished and the new cooling tower mounted directly on the foundation, or the basin could be backfilled and the cooling tower mounted on the basin.

5. AHA Mechanical Contractors was awarded the project, and based upon Mr. Rudolph's statement that the basin could either be demolished and the cooling tower mounted on the ground or the basin backfilled and the cooling tower mounted on top of the basin, AHA Mechanical Contractors elected to backfill the basin with crushed concrete and the frame for the new cooling unit mounted to the basin.

6. The basin was backfilled with crushed concrete and compacted with a 11,000 pound compacting machine. After this was done, Mr. Tony Wright of Shelby County Schools requested that the concrete cap [] be placed on top of the crushed concrete be increased from 6 inches to 8 inches. Mr. Wright further requested that steel pilings be placed at various locations within concrete fill going from the cooling tower support frame down to the foundation. Even though none of this was specified in the bid documents, scope of work or drawings prepared by Shelby County Schools, this additional work was performed as requested by Shelby County Schools.

7. The concrete cap for the basin was then poured utilizing 4000 pound-per-square inch strength concrete. The support frame for the new cooling tower was then attached to the basin as directed by a structural engineer retained by AHA Mechanical Contractors.

8. Before the cooling tower could be mounted to the frame, Shelby County Schools began demanding letters from an engineer stating that the installation work met current building codes.

9. As the Project Manager for AHA Mechanical Contractors responsible for overseeing the work on the Riverview Elementary K-8 cooling tower replacement project, all work performed by AHA Mechanical was done in compliance with all applicable building codes.

- 30 -

10. The concrete cap that was poured on the top of the basin functions solely for the purpose of capping off the basin and was not constructed to support the frame. The frame is supported totally by the walls of the basin and the additional steel piles which penetrate through the concrete backfill down to the concrete foundation and attached to the steel frame at various locations.

11. Compliance with code requirements for seismic and wind loading is accomplished by the fact that the support frame is attached with welding and other fittings to the concrete basin. Moreover, the concrete basin is more than adequate to support the new cooling tower because it weighs significantly less than the original cooling tower supported by the cooling tower basin.

Ms. Donna Burlow is the President of AHA. Her declaration states, in relevant part:

3. AHA Mechanical Contractors retained Marshall Davis, P.E. of the engineering firm Davis Patrikios Criswell, Inc. to review certain information, contract documents and other information regarding the cooling tower installation. On July 8, 2020, Mr. Davis prepared a letter regarding his analysis of frame for the structural support for the cooling tower. A copy of that letter is attached hereto as Exhibit "A."

4. After AHA Mechanical Contractors began its work on the project, Shelby County Schools requested a letter from an engineer regarding the as-built conditions of the structure supporting the new cooling tower. On October 29, 2020, a second letter was prepared and submitted by Mr. Davis. A copy of that letter is attached hereto as Exhibit "B."

5. In a letter dated November 11, 2020, several additional questions were raised by Shelby County Schools about the as-built conditions of the cooling tower support. On March 3, 2021, a third letter was prepared by Mr. Davis to respond to those questions. A copy of that letter is attached hereto as Exhibit "C."

We have previously discussed the letters exhibited to Ms. Burlow's declaration.

### 4. SCBE's Response to Contractor's Statement of Additional Undisputed Material Facts

In response to Contractor's statement of additional undisputed material facts, SCBE filed the same response to statements 1 through 11, 18, and 23: "Admitted for purposes of ruling on [SCBE's] Motion for Partial Summary Judgment only. [SCBE] denies that this is a material fact." The Board filed a similar, though distinct, response to statements 19, 21, and 22: "Admitted for purposes of ruling on [SCBE's] Motion for Partial Summary Judgment only."

- 31 -

As to statements 12 and 20, SCBE responded as follows:

> Denied. Consistent with the IFB's Scope of Work incorporated by reference into the Facilities Services Contract executed between the parties, [SCBE] requested that Contractor provide documentation that it had met its contractual obligation to have the "concrete base . . . reviewed and verified to meet load and current code criteria." [SCBE] denies that there is a genuine dispute as to this fact; [SCBE's] requests are outlined in their numerous communications to Contractor, which speak for themselves.

Finally, as to Contractor's statements 13, 14, 15, 16, and 17, SCBE responded: "Denied. This purported fact is inadmissible. See Tenn. R. Evid. 701 & 702. [Contractor] has not demonstrated that Mr. Raymer has technical knowledge or experience sufficient to offer an expert opinion . . . ."

We include the foregoing filings not to tax the length of this opinion, but to show the large amount of extrinsic, or parol, evidence that was offered in support of SCBE's motion for summary judgment and Contractor's response in opposition thereto.

### B. Contract Interpretation

Again, this is a breach of contract case. It is well settled that, when the terms of a contract are unambiguous, "issues of contract interpretation are regularly considered issues of law, which in turn make them well-suited for summary judgment." *Strategic Acquisitions Grp., LLC v. Premier Parking of Tenn., LLC*, No. E2019-01631-COA-R3-CV, 2020 WL 2595869, at \*4 (Tenn. Ct. App. May 22, 2020). If the contractual language is clear and unambiguous, "the literal meaning of the language controls," and the determination of the parties' intent "is generally treated as a question of law because the words of the contract are definite and undisputed," leaving no genuine factual issue for a court or jury to decide. *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, Corbin on Contracts, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. Of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). Indeed, "where a contract is unambiguous, the court may not look beyond the four corners of the contract to ascertain the parties' intention." *Accredo Health Grp. Inc. v. GlaxoSmithKline LLC*, No. W2015-01970-COA-R9-CV, 2016 WL 4137953, at \*7 (Tenn. Ct. App. Aug. 3, 2016) (citing *Rogers v. First Tenn. Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987)). In other words, the parol evidence rule bars extraneous evidence used "'to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (quoting *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)). "The parol evidence rule serves to secure the integrity of contracts and to guard against fraud by a party who agrees to the unambiguous terms of a written agreement and then seeks to disavow those terms through extrinsic evidence." *Textron Fin. Corp. v. Powell*, No. M2001-02588-COA-R3-CV, 2002 WL 31249913, at \*5 (Tenn.

- 32 -

Ct. App. Oct. 8, 2002) (citing 32A C.J.S. Evidence § 1132, § 1159 (1996); *see **Tidwell v. Morgan Bldg. Sys., Inc.***, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992)). However, where a contract is ambiguous — that is, susceptible to more than one reasonable interpretation — the parties' intent cannot be determined by a literal interpretation of the language. *See **Planters Gin Co.***, 78 S.W.2d at 890. Accordingly, several exceptions to the parol evidence rule exist.

As relevant here, Tennessee courts have held that parol evidence can be used to show acceptance of terms in a contract and to define non-obvious terms in an agreement. *See, e.g., **Jones v. Brooks***, 696 S.W.2d 885, 886 (Tenn. 1985) (finding that parol evidence could be considered where a contract provision was subject to two reasonable interpretations); ***Coble Systems, Inc. v. Gifford Co.***, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981) (noting that parol evidence may be used to clarify latent ambiguities in written agreements). Furthermore, this Court has explained that, although

> the parol evidence rule prevents contracting parties from using extraneous evidence to alter or vary the terms of an integrated, unambiguous contract[,] [*s*]*ee **GRW Enters., Inc. v. Davis***, 797 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990) (citing ***Jones v. Brooks***, 696 S.W.2d 885, 886 (Tenn. 1985))[,] [t]he rule does not . . . prevent the use of extraneous evidence to prove a separate agreement made after the written one. ***Id.*** (citing ***Brunson v. Gladish***, 174 Tenn. 309, 125 S.W.2d 144, 147 (Tenn. 1939)). Parol evidence is admissible to prove a subsequent modification to a written contract, as it is itself a separate contract. ***Id***.

***In re Estate of Nelson***, No. W2006-00030-COA-R3-CV, 2007 WL 851265, at *17 (Tenn. Ct. App. March 22, 2007*)*; *see also **Smith v. Hi-Speed, Inc.***, 536 S.W.3d 458, 471 (Tenn. Ct. App. 2016) (allowing evidence of conduct occurring after the execution of a written lease agreement to show the basis for modification of a written contract); ***Schwartz v. Diagnostix Network All., LLC***, No. M2014-00006-COA-R3-CV, 2014 WL 6453676, at *10 (Tenn. Ct. App. Nov. 17, 2014), *perm. app. denied* (Tenn. April 10, 2015) (citing ***Brunson v. Gladish***, 125 S.W.2d 144, 147 (Tenn. 1939)) ("[E]vidence of an agreement made subsequent to the execution of the written agreement, even though it may have the effect of adding to, changing, modifying, or altogether abrogating the parties' written agreement, is not barred by the parol evidence rule.").

Here, it is clear that the trial court considered extrinsic, or parol, evidence outside the parties' Contract in reaching its determination that SCBE was entitled to summary judgment on its breach of contract claim. As set out in the trial court's order granting SCBE's motion:

> 5. On October 20, 2020, Contractor's engineer, Mr. Marshall Davis, declined to write an engineer letter that would address the concrete base for the

cooling tower, stating: "We have some concerns with how the slab was done. We do not feel comfortable writing a letter with the current as-built condition. The main concern is the overturning of the cooling tower during a high wind or seismic event. For us to write a letter we would require additional modification; however, another engineer may be willing to write a letter for the as-built condition."

6. On October 29, 2020, Mr. Davis prepared a letter for the Contractor that states "The as-built condition meets the overall design intent."

7. Even though the October 29, 2020 letter says that the as-built condition meets the overall design intent, the letter does not address the concrete base or state whether the concrete base was ever reviewed and verified to meet load and current code criteria before any modifications were made to it by the Contractor.

∎▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪∎

1. Contractor materially breached the Riverview Contract by failing to have the concrete base for the cooling tower reviewed and verified to meet load and current code criteria.

2. The School Board was justified in terminating the Riverview Contract based on Contractor's material breach of the Riverview Contract.

Tennessee Rule of Civil Procedure 56.04 states that, "The trial court shall state the legal grounds upon which the court denies or grants the motion [for summary judgment], which shall be included in the order reflecting the court's ruling." Here, based on the sheer amount of parol evidence filed with the motion for summary judgment, the trial's initial task in construing this Contract was to determine whether the disputed language was ambiguous. *Planters Gin Co.*, 78 S.W.3d at 889-90. From its order, the trial court considered Mr. Davis' October 20, 2020 correspondence, wherein he "declined to write an engineer letter that would address the concrete base for the cooling tower," and his letter of October 29, 2020, wherein he references the "as-built condition." However, the trial court relied on this parol evidence without first making a determination that the parties' Contract is, in fact, ambiguous and, thus, outside the parol evidence rule.

Nonetheless, the trial court's failure to find an ambiguity before considering parol evidence is not fatal to its order. This is because the question of "[w]hether terms of a contract are ambiguous is a question of law." *Peninsular Life Ins. Co. v. Chism*, No. 02A01-9205-CV-00140, 1993 WL 339299, at *4 (Tenn. Ct. App. Sept. 8, 1993) (citing *Tennessee Consol. Coal Co. v. United Mine Workers of Am.*, 416 F.2d 1192, 1198 (6th Cir. 1969)). On appeal, our standard of review of questions of law is de novo without a presumption of correctness afforded to the lower court's conclusions of law. *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004) (citing *State v. Williams*, 38 S.W.3d 532, 535 (Tenn. 2001)). As such, in our present case, we will review the disputed language in the Contract, "Concrete base shall be reviewed and verified to meet

- 34 -

load & current code criteria," to determine whether it is ambiguous.

### 1. Ambiguity

In general terms, an ambiguity occurs where a word or phrase is capable of more than one meaning. ***Campora v. Ford***, 124 S.W.3d 624, 628 (Tenn. Ct. App. 2003) (citing ***Walk-in Med. Ctrs., Inc. v. Breuer Capital Corp.***, 818 F.2d 260, 263 (2d Cir.1987)). "An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." ***In re Estate of Elrod***, No. E2014-02205-COA-R3-CV, 2015 WL 5304624, at *6 (Tenn. Ct. App. Sept. 10, 2015) (citations omitted).

### a. Patent Ambiguity

Parol evidence is not admissible to remove a patent ambiguity but is admissible to remove a latent ambiguity. ***White v. Kaminsky***, 264 S.W.2d 813 (Tenn. 1954). The Tennessee Supreme Court has explained that a patent ambiguity "is one produced by the uncertainty, contradictoriness, or deficiency of the language of an instrument, so that no discovery of facts, or proof of declarations, can restore the doubtful or smothered sense without adding ideas which the actual words will not themselves sustain." ***Weatherhead v. Sewell***, 28 Tenn. (9 Hum.) 272, 295 (Tenn.1848); *see also* ***Teague v. Sowder***, 114 S.W. 484, 488 (Tenn. 1908).

### b. Latent Ambiguity

On the other hand, a latent ambiguity exists:

> [W]here the equivocality of expression, or obscurity of intention does not arise from the words themselves, but from the ambiguous state of extrinsic circumstances to which the words of the instrument refer, and which is susceptible of explanation by the mere development of extraneous facts, without altering or adding to the written language, or requiring more to be understood thereby than will fairly comport with the ordinary or legal sense of the words or phrases made use of.

***Weatherhead***, 28 Tenn. (9 Hum.) at 295; *see also* ***Teague***, 114 S.W. at 488. "A latent ambiguity is generally found to exist where the words of a written instrument are plain and intelligible yet have capability of multiple meanings given extraneous facts." ***Perdue v. Estate of Jackson***, No. W2012-02710-COA-R3-CV, 2013 WL 2644670, at *5 (Tenn. Ct. App. June 12, 2013) (citing 96 C.J.S. Wills § 893 (2001)). A latent ambiguity, which has also been defined as an "uncertainty of detail," "must be resolved by inquiry regarding the actual intent of the parties as to the meaning of the words used by them." ***First American Nat'l Bank of Nashville v. Hunter***, 581 S.W.2d 655, 659 (Tenn. Ct. App. 1978). "For

such purpose, any statements, acts or writings of the parties and any business custom known to them may be considered to the extent that it reflects upon the mutual intent of the parties at the time of making of the contract as to the meaning of the word or phrase used by them in their contract." *Id.* (citing *Springfield Tobacco Redryers Corp. v. City of Springfield*, 293 S.W.2d 189 (Tenn. Ct. App. 1956); *Frierson v. International Agriculture Corp.*, 148 S.W.2d 27 (Tenn. Ct. App. 1940); *McDowell v. Rambo*, 111 S.W.2d 892 (Tenn. Ct. App. 1937); 17–A C.J.S. Contracts § 597a, b, p. 1163 *et seq.*).

## C. Application to the Present Case

Here, the disputed language, "Concrete base shall be reviewed and verified to meet load & current code criteria," is not technically (patently) ambiguous; however, it is clear from the record that several latent ambiguities have arisen as the parties have attempted to perform the Contract. We conclude that the disputed language contains at least five latent ambiguities.

First, it is unclear what the parties meant by "concrete base." Was this the existing base that was left when the old HVAC system was removed to make way for the new system? Was this a new "concrete base" that Contractor was responsible for constructing? Or was this the concrete base as modified by Contractor through its addition of compacted crushed concrete, water, and steel frames to the existing base?

Second, SCBE maintains that it was Contractor's responsibility to procure the review and verification, but the Contract language does not specifically state that it is Contractor's burden to do so. The Contract states only that the "[c]oncrete base shall be reviewed and verified . . . ."

Third, although SCBE argues that the review and verification must be completed by a structural engineer, there is no language in the Contract to that effect.

Fourth, the term "load" is not defined in the Contract. Rather, the first attempt to define this term was in Mr. Sides' October 8, 2020 email, *supra*.

Finally, there is no specification in the Contract concerning which "code" applies. In Exhibit F, *supra*, Mr. Sides refers to both "Shelby County Code Enforcement" and the "International Building Code." However, in Exhibit L, SCBE refers to the "International Mechanical Code" and specifically section 908.4 thereof. However, none of these codes is specifically listed in the Contract.

If the foregoing ambiguities are capable of resolution, it will likely be through parol evidence.[2] Although the determination of whether there is an ambiguity is a question of

---

[2] On remand, the trial court is not required to consider parol evidence. We note that the parties'

Contract is integrated insofar as Paragraph 27 thereof states that, "This Agreement, together with the Scope of Work and other documents that may be executed pursuant to this Agreement and incorporated herein, constitutes the entire agreement between the Parties."  As the Tennessee Supreme Court has explained:

> [T]he parol evidence rule is most restrictive when the contract at issue is fully or completely integrated—that is, when it is intended to be the complete and exclusive statement of the parties' agreement. ***Schaeffer v. Am. Honda Motor Co.***, 976 F. Supp. 736, 741 (W.D. Tenn. 1997) (quoting Restatement (Second) of Contracts §§ 209-210 (1981) ) ("An integrated agreement is a writing constituting a final expression of one or more terms of an agreement; a completely integrated agreement has been 'adopted by the parties as a complete and exclusive statement of the terms of the agreement.'").

***Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.***, 566 S.W.3d 671, 696 (Tenn. 2019) (footnote omitted).

Alternatively, the trial court may consider parol evidence (and may allow the parties to develop the record further) in an effort to determine the parties' intent at the time they entered into the Contract, or any modifications they may have made to that Contract through subsequent negotiations. Indeed, as noted above, "[t]he [parol evidence] rule does not . . . prevent using extraneous evidence" to prove a separate agreement made after the written one. ***GRW Enters., Inc.***, 797 S.W.2d at 610-11 (citations omitted). Parol evidence is admissible to prove a subsequent modification to a written contract, as it is itself a separate contract. ***Id.***

However, even if the trial court considers parol evidence on remand, it may conclude that such evidence cannot resolve the disputes between the parties.  In such case, the trial court is not precluded from declaring the disputed language unenforceably vague.  Indeed, this Court has explained that:

> Courts will not enforce a contract that is vague or indefinite or missing essential terms, and will not make a new contract for the parties. ***Four Eights, LLC v. Salem***, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005) (citation omitted); ***Marshall v. Jackson & Jones Oils, Inc.***, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999) (citation omitted). However, a finding that a contract is sufficiently definite is favored, so as to carry out the reasonable intentions of the parties. Thus, courts will seek to avoid finding that an agreement is too uncertain to be enforceable by considering the surrounding circumstances and the conduct of the parties. *See* ***In re Estate of Ohrt***, 516 N.W.2d 896, 901 (Iowa 1994) (citation omitted).
> This may at times result in the court implying a term not expressly stated in the contract. When the parties' bargain is sufficiently definite to be a contract, but they have not agreed with respect to a term that is necessary to a determination of their rights and duties, a term which is reasonable may be supplied by the court. Restatement (Second) of Contracts § 204 (1981).

***German v. Ford***, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. Sept. 28, 2009).

If the trial court should determine that the disputed language is too vague or indefinite to enforce and that it cannot imply the necessary terms from the parol evidence, it should attempt to sever the disputed language, *i.e.,* "Concrete base shall be reviewed and verified to meet the load & current code criteria,"  from the remainder of the Contract as contemplated in Paragraphs 25 and 29 thereof, to-wit:

law, the determination of the terms of an ambiguous contract is for the trier of fact. ***Tennessee Consol. Coal Co.***, 416 F.2d at 1198 ("When the court has determined that the contract is ambiguous the terms of the contract are to be determined by the jury if the case is tried by a jury, or by the court if the case is tried by a court. Evidence of the surrounding circumstances and the practical construction of the parties is admissible to aid in its interpretation."). Unfortunately, although the trial court here considered parol evidence, none of the ambiguities discussed above were resolved. As such, disputes of material fact persist, which preclude the grant of summary judgment.

Turning to the trial court's order granting SCBE's motion for summary judgment, as noted above, the trial court relied on Mr. Davis' October 29, 2020 letter to Contractor, wherein Mr. Davis stated that, "The as-built condition meets the overall design intent." The trial court found that the letter "d[id] not address the concrete base or state whether the concrete base was ever reviewed and verified to meet load and current code criteria before any modifications were made to it by the Contractor." In the absence of this information, the trial court concluded that Contractor breached the "reviewed and verified" provision of the Contract.

It is well-settled that, in assessing evidence for purposes of summary judgment, courts must examine the evidence in the light most favorable to the nonmoving party while drawing all reasonable inferences in the nonmoving party's favor. ***Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn. 1995). Furthermore, "[c]ourts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion." ***Staples v. CBL & Assocs., Inc.***, 15 S.W.3d 83, 89 (Tenn. 2000); *see* ***Shadrick v. Coker***, 963 S.W.2d 726, 737 (Tenn.1998). Moreover, in interpreting ambiguous contracts, the interpretive rule of *contra proferentem* applies, under which courts will construe ambiguous language against the party who drafted it – here, SCBE. ***See 101 Constr. Co. v. Hammet***, 603 S.W.3d 786, 795 n. 9 (Tenn. Ct. App. 2019) (citing Black's Law Dictionary (9th ed. 2009)) ("*Contra proferentem*, or Latin for 'against the offeror,' is a contract interpretation doctrine that construes ambiguities against the drafter of the document."). In the instant case, the trial court's findings and inferences from

25. SEVERABILITY. The provisions of this Agreement are severable. If any section, paragraph, clause or provision of this Agreement shall be finally adjudicated by a court of competent jurisdiction to be invalid, the remainder of this Agreement shall he unaffected by such adjudication and all of the remaining provisions of this Agreement shall remain in full force and effect as though such section, paragraph, clause or provision, or any part thereof so adjudicated to be invalid, had not been included herein, unless such remaining provisions, standing alone, are incomplete and incapable of being executed in accordance with the intent of the parties to this Agreement.

\*\*\*

29. SEVERABILITY. If any provision of this Agreement is held invalid or otherwise unenforceable, the enforceability of the remaining provisions shall not be impaired thereby.

Mr. Davis' October 29, 2020 letter indicate that it did not comply with the foregoing rules of contract construction.

First, the trial court did not resolve the ambiguities concerning what the parties meant by "concrete base," "load," or "code." Second, the trial court made inferences against the Contractor/non-moving party on questions of the scope of work, and whether it was Contractor's obligation to procure the review and verification from a structural engineer hired by Contractor.

Turning to the parol evidence, in Exhibit D, Mr. Davis' letter to Contractor dated July 8, 2020, he states that "The new cooling tower support frame will be installed on a new concrete foundation designed by others." In Exhibit E, the October 8, 2020 letter from SCBE to Contractor, SCBE raises a question concerning what Mr. Davis meant by "new concrete foundation designed by others," to-wit: "The [July 8, 2020] letter states, 'The new cooling tower support frame will be installed on a new concrete foundation *designed by others* at the existing cooling tower location' [emphasis in original] . . . . The new concrete foundation design from a licensed structural engineer has not been received for review, comment, and/ or approval. . . ." The October 8, 2020 letter goes on to outline certain criteria that Contractor must satisfy "[b]efore any work will be able to progress." These criteria included: (1) "Provide a report from **a** licensed structural engineer stating that the **existing** concrete base/ foundation will meet the load criteria of the new cooling tower and associated structural supports"; or (2) "[p]rovide a detail from **a** licensed structural engineer for the **new** concrete foundation to comply with the July 8, 2020 letter from DPC Engineers that will support the new cooling tower support frame"; and (3) "[p]rovide documentation, *i.e*, compaction tests, from a licensed geotechnical testing agency that demonstrates that the loose fill that is currently in place at the **existing** concrete base"; (4) "The **existing** concrete base foundation must be prepped for new concrete slab installation per standard construction practices"; (5) (though arguably not a requirement) to act on SCBE's "high[] recommend[ation]" to "engage a licensed structural engineer regarding this matter to obtain proper direction." (Emphases added).

In Exhibit L, the November 11, 2020 letter from Mr. Sides to Contractor, SCBE requested numerous "specific confirmations" from Contractor, including, in part: (1) "Confirmation from **a** structural engineer that the **existing** concrete base in its original condition prior to the current modifications and without its current modifications will meet the load of the new cooling tower and structural support frame and comply with any applicable codes"; (2) "Confirmation and approval from **the Contractor's** structural engineer that the **existing** modifications completed by the Contractor to the existing concrete base meet the criteria of the letters from the structural engineer, Davis Patrikios Criswell, dated July 8, 2020 and October 29, 2020"; (3) "Confirmation from **their [*i.e.,* Contractor's]** structural engineer that the **new** composite fill installed by the Contractor in the existing concrete base meets applicable codes"; (2) "Confirmation and approval from **their** structural engineer that the thickness of the **new** concrete slab installed by the

Contractor meets the requirement." (Emphases added).

Based on the emphasized language, *supra*, SCBE's own correspondence creates disputes of fact concerning whether the review and verification requirement is to be completed by "a" structural engineer, or whether it must be completed by "their [*i.e.*, the Contractor's]" structural engineer. The Contract does not specify that the review and verification must come from a structural engineer, nor that Contractor must hire that engineer. Indeed, in Exhibit F, Mr. Sides' October 8, 2020 email to Contractor, he appears to waive any requirements for an engineer's report, stating: "This documentation does not have to be from a structural engineer but shall include language that states AHA Mechanical Contractors will take full and complete responsibility and liability in regards to the existing concrete base and its ability to meet the load criteria of the new installation as well as meets the current adopted building code requirements for such installation."

The emphasized language also compounds the ambiguity concerning whether the "concrete base" is the existing base, a new base (poured by Contractor), or the modified base. In its statement of additional undisputed material facts, Contractor asserts that SCBE's agent, Mr. Clay Rudolph, informed Contractor that the concrete base did not have to be repoured, but that it could be modified, which the Contractor did. Giving the reasonable inference in favor of Contractor, one could conclude that Contractor's modifications to the existing base were done in reliance on Mr. Rudolph's statements. Also, as set out in Exhibit M, the November 19, 2020 letter from Contractor to SCBE, Contractor states that, "The existing cooling tower weighs 16,500 lbs. and the new cooling tower weighs 11,800 lbs. The existing foundation has the capacity to support the new cooling tower." Giving Contractor the inference, the existing concrete base was sufficient to support 4,700 pounds more than what the new HVAC equipment weighs. This is the gravamen of the parties' dispute. However, it appears that the trial court failed to consider these additional facts.

Furthermore, the trial court inferred that Mr. Davis' statement that "[t]he as-built condition meets the overall design intent" did not refer to the concrete base. However, as noted above, it appears that the existing concrete base was the only portion of the old HVAC construction that was left, so a reasonable inference in favor of the non-moving party/Contractor would be that the only structure left in "as-built condition" would have to be the concrete base, thus Mr. Davis' statement that it "meets the overall design intent" reasonably could be found to satisfy the "review and verified" criterion. However, the trial court infers that Mr. Davis' "as-built condition" statement was not in reference to the existing concrete base.

As to the scope of work, although Exhibits E and L set out very detailed construction requirements and "specific confirmations" that Contractor must satisfy, there is dispute as to whether the Contract mandates these requirements and confirmations on the part of Contractor. This is a point Contractor made in Exhibit M, the November 19, 2020 letter

from Contractor to SCBE, wherein it stated that:

> We feel [SCBE] will obtain a final product that is completed effectively and efficiently with the specifications and direction we were provided from the bid documents and the requirements stated in the IFB scope of work along with the direction of Clay Rudolph at the site visit. We obtained engineer letters as requested and we made the modifications recommended by the Engineer of DPC. There are items listed that if requested should have been put into specification during the bid process. We can't be expected to perform items that were not in any specs for this project. We have obtained an Engineer to ensure that the project meets manufacturers recommendations and load.

> I am happy to have the specific details from the School System with all of the above information, however this should have been provided as the specifications for this project during the bidding process, if all of this was to be performed. We only had direction from IFB scope of work (I have included the scope) and Pre-bid and Engineer recommendations and we have followed those guidelines. We are happy to do any additional items being requested with reimbursement as these items should have been part of the specifications of the job. I understand you may think this is standard practice items but we are taught to go strictly by the specifications provided and from the Pre-Bid and unfortunately we were not given any specifications for this job other that the option to use existing foundation, demo it, or backfill and to follow manufacturer design for the frame. We feel that we have performed what we were contracted to do.

As such, there is dispute of fact concerning the scope of work.

Furthermore, questions remain concerning what the parties intended by the inclusion of the term "load," and whether the subsequent definition provided by Mr. Sides in his October 8, 2020 email to Contractor, *i.e.*, Exhibit F, is valid and enforceable in view of industry terms and practices. Moreover, the trial court's order does not resolve what the parties' meant by "code." Based on Mr. Sides' and SCBE's use of different codes, *i.e.,* "Shelby County Code Enforcement," "International Building Code," and "International Mechanical Code," there is still a question concerning this term.

Finally, a close reading of the January 15, 2021 "Notice of Termination," *i.e.,* Exhibit P, indicates that SCBE knew that ambiguities and disputes existed when it terminated the Contract. Therein, SCBE states, "The parties have not reached an agreement with respect to Contractor's default under the Construction Contract," and note "the failure of the consultation process to generate an acceptable resolution." We agree. In sum, there are disputes of material fact and remaining ambiguities arising from those

- 41 -

disputed facts that preclude summary judgment.

## D. Attorney's Fees and Costs

Having determined that the trial court erred in granting SCBE's motion for summary judgment, we also reverse its award of SCBE's attorney's fees and costs under the Contract. For the same reason, SCBE's request for appellate attorney's fees and costs is denied.

## V. Conclusion

For the foregoing reasons, the trial court's order is reversed, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellee, Shelby County Board of Education. Execution for costs may issue if necessary.

s/ Steven W. Maroney
STEVEN W. MARONEY, JUDGE